Good morning, and may it please the Court. Ashley Honnold for the United States. The District Court erred in granting a nationwide advisory opinion on the scope of Title VII and its interaction with RFRA and the First Amendment. The District Court issued a series of categorical, abstract rulings, untethered to any particular facts, and in the absence of a concrete case or controversy. The decision violates bedrock Article III principles, and it cannot be squared with the Supreme Court's repeated instruction that religious liberty claims require an individualized, context-specific analysis. To make matters worse, the District ill-defined classes. Turning first to the jurisdictional issues, plaintiffs' claims are not ripe for review because they call for factual development that has not yet occurred and may never occur. Plaintiffs are not bringing a facial challenge. The whole point of a facial challenge is that you do not care what the facts are, and you are only looking at the plaintiffs are bringing an as-applied challenge. They're not saying that Title VII on its face violates their religious liberties. They're saying that specific applications of Title VII to them would violate their religious liberties, and by definition, an as-applied challenge requires the facts of how the statute is being applied to plaintiffs. Do you dispute that the plaintiffs have standing to bring their claims? Yes, Your Honor. You went to ripeness. I think they're distinct, right? Talk a little bit about their standing. Sure. So plaintiffs do not have standing in this case because there is no injury. Plaintiffs have not shown that there is any credible threat of enforcement or that their religious exercise has been chilled. There's no credible threat of enforcement in this case because EEOC has made clear that it takes religious liberties seriously. It has an entire compliance manual dedicated to religious discrimination, and the manual explains that a nuanced balancing is required, and it expressly instructs EEOC investigators to take great care and to consult with legal counsel in situations where Title VII and religious liberties may intersect. And this manual shows that RFRA is not just an affirmative defense that can be raised in a specific enforcement action. RFRA also informs how the agencies will exercise their enforcement discretion, and because of that, plaintiffs may never face an EEOC enforcement discretion. But the agency never disclaimed that they wouldn't try to enforce their guidance. I mean, you mentioned the guidance about taking religious claims seriously, but the other EEOC issue says you can't discriminate on these grounds raised by the plaintiffs. So do the plaintiffs not have a credible fear that one day EEOC is going to come knocking at the door? And does that give them standing for declaratory relief? Plaintiffs don't have standing. EEOC has not disclaimed enforcement because EEOC cannot do that at this level of generality in the abstract. But here, plaintiffs have made clear that their religious exercise is not being chilled by any fear of enforcement. As the District Court recognized, this is on page 1721 of the Record on Appeal, plaintiffs have made clear that they have no intention of changing their employment policies. So waiting for a right case will not cause plaintiffs to violate their religious convictions. Do they have to wait until there's an actual enforcement action? I mean, how do you square that with the availability of declaratory relief? Pre-enforcement action, I guess. Your Honor, the Supreme Court has made clear that pre-enforcement suits are not the norm. They are the exception, not the rule. And the Supreme Court recently reiterated this in the Whole Woman's Health decision. The Supreme Court explained that it has never recognized an unqualified right to pre-enforcement review, even for claims raising fundamental constitutional rights. And the Supreme Court said that many important statutory and constitutional rights are, as a practical matter, typically asserted as defenses and not in pre-enforcement cases. So there's nothing strange or unfair about having plaintiffs wait for a right case before bringing their claims. When could they bring a pre-enforcement action? The Supreme Court has made clear that there's a high bar for pre-enforcement review. Plaintiffs would have to demonstrate a credible threat of enforcement. And if you look at all of the pre-enforcement cases that plaintiffs cite in their papers, those are cases in which there are facial challenges to statutes. And here we have an as-applied challenge. And those are cases in which there is an actual chill of First Amendment activity. And we do not have either of those factors here. The class-wide nature of the relief that the District Court granted only underscores why plaintiffs' claims are not right. The District Court purported to adjudicate all possible RFRA claims for any employer in this broad class. But the fact that an employer itself opposes what plaintiffs call homosexual or transgender conduct does not necessarily mean that that employer's religious exercise would be substantially burdened by merely employing someone who engages in that conduct. Even plaintiffs don't defend this part of the District Court's opinion. And if it were the case that it necessarily burdened the employer's religious exercise to just give someone a salary if they don't agree with the conduct that they engage in, that would mean that a Sikh employer of a secular business could fire men who cut their hair or don't wear turbans. It would mean that a Jewish employer could fire employees who do not keep kosher. So assuming those examples that you're giving are pertinent here, you're basically telling us that the EEOC probably would engage in enforcement if an employer were to do those things. Otherwise, the EEOC is not doing its job. Is that right? No, Your Honor. The point I was trying to make with these hypotheticals is that merely employing someone, just giving someone a salary, does not necessarily mean that you endorse all of the conduct that the employee engages in in their personal life outside of work. And the EEOC has made clear that they do take religion seriously. And this is not just talk. If you look at the Newsom case that we cited in our brief, in that case, after the employer raised a religious objection in response to a charge of discrimination, EEOC responded by dismissing the charge. It did not bring an enforcement action against this religious employer. In fact, plaintiffs can only point to one example of any EEOC enforcement action against an employer who raised a religious objection, and that's the Harris Funeral Home case. Well, that was a pretty significant case because it was combined with Bostock, wasn't it? You can't really say that that was an insignificant case. Your Honor, the government does not think the case was insignificant, but if you look at the Sixth Circuit's decision in Harris Funeral Homes, it's clear that RFRA requires a fact-specific analysis. In that case, the employer alleged two specific burdens to its religious exercise, and the Sixth Circuit conducted a fact-specific analysis based on the facts in the record of that case. Now, whether this Court agrees with the details of the decision in Harris Funeral Homes is beside the point. What matters here is that there was a fact-specific analysis because there were facts in that record for the Court to look at. In Harris Funeral Homes, it does not show that EEOC will ignore the religious objections or bring enforcement actions against religious employers. In that case, the employer didn't raise its RFRA objection before the agency at all in the administrative proceedings, so EEOC did not have an opportunity to decide not to bring the enforcement action. And EEOC's position in Harris did not reflect an across-the-board determination that Title VII will always override a RFRA defense. EEOC's position was based on a fact-intensive analysis of the facts of that case. Well, suppose that the facts show that an employer is discriminating against an employee for homosexual activity. Let's assume that. Let's assume that the facts establish that that's exactly what happened, that the employee was engaging in those activities and that he or she was disciplined or fired for engaging in those activities. And to go to the EEOC with a complaint, are you telling us that there's no indication that the EEOC would seek any kind of enforcement action in that case? Yes, Your Honor. There's no credible threat of enforcement in that case because EEOC has made clear that it exercises its enforcement discretion with RFRA in mind. Its compliance manual explains that it takes religious liberty seriously. So then the employer can claim a RFRA exception in that case and not be subject to enforcement action. I mean, we can take that as you're speaking on behalf of the United States and telling us that that's what would happen. It's correct that the employer could raise a RFRA objection in that case, and then EEOC would analyze it in the specific context of that case. And it might be the case that, like, in Newsom, EEOC might decide not to bring an enforcement action. So the government is not— I mean, I've given you the hypothetical facts. What other facts would the EEOC need in order to decide whether to enforce or to overlook? Sure. So I think two cases give examples of what kind of facts the court would look at. So in Harris Funeral Homes, there were specific facts that the court considered. It looked at things like the context of the employment dispute. It looked at the solemnity of the funeral home context. And in this court's decision, in the East Texas Baptist University v. Burwell case, this court explained that a religious entity cannot simply declare a substantial burden on its religious exercise. This court said it's in fact— I'm just talking about, let's just take an ordinary commercial activity. Let's say a mom-and-pop hardware store. But this is just the hypothetical. And they fire an employee because that employee engages in homosexual activity. Those are the facts. Those are the undisputed facts. That's the only reason that the person was fired. What other context do you need? So the court would need context about how to apply the RFRA analysis in that situation. So go through the context. What would the EEOC look at in terms of whether that was a violation or not? So as the Supreme Court explained in Ocentro and again in Hobby Lobby, the RFRA analysis is a fact-specific, to-the-person analysis. We have to look at the harm to the government—not only the substantial burden on the religious employer, but the government has to show compelling interest and narrow tailoring. And that's not a compelling interest at a broad level of generality. It's the harm to the government in giving a religious exemption to this particular employer, this specific exemption. So you have to look at how this is being applied to a particular religious claimant in a particular fact-bound situation. But even if this court disagrees and thinks that there is no further factual development needed in this case as to Braidwood, as to the specific plaintiff, then this court should at least reverse as to the class-wide nature of the district court's order. Because plaintiffs have certainly not shown that there has been enough factual development for all of the employers in this broad class. And if this court were to reverse on the class-wide relief and only affirm as to Braidwood on the BRFRA claim, then the rest of Braidwood's Title 7 claims would all become moot because plaintiff would have been afforded complete relief. So that's kind of a simple way to handle this difficult case. If there are no further questions, I'll save the rest of my time for rebuttal. Yes, you've saved time for rebuttal. Thank you. Thank you, Your Honors. May it please the Court. With the Court's permission, I'd like to begin by addressing the government's justiciability objections before proceeding to the merits of the respective appeals. The government claims in this case that the plaintiffs lack Article 3 standing and that their claims are unripe because the EEOC has not yet threatened an enforcement action directed at the plaintiffs specifically. But a litigant who seeks pre-enforcement relief is not required to allege or show an imminent or threatened action directed at that particular litigant. Well, that's particularly true in the First Amendment context. Absolutely, in the First Amendment context. And this is a First Amendment claim we're talking about, freedom of religion, and there's no reason why that constitutional right should be accorded any less status than the right of freedom of speech or, for that matter, the right of abortion, which, until recently, before it was overruled, courts were very generous in allowing pre-enforcement challenges to a non-textual constitutional right. It was overruled on the merits, but none of those decisions, Dobbs and anything subsequent to Dobbs, nothing yet has undercut the holdings of those cases with respect to Article 3 standing or ripeness. So it remains good law, in our view, for the courts to say that you can bring a pre-enforcement challenge, whether it's the right of free speech, whether it's the now overruled right of abortion, without being required to show that the government officials that you're suing have specifically threatened you. All that's needed in a case like this is for the plaintiffs to allege and show that the violence against others, such as the Harris Funeral Homes, creates a fear or a threat that the plaintiff might be subject to enforcement action if it acts in a desired manner, and the injury comes from the chilling effect that that fear or threat imposes on the plaintiff's constitutional freedoms. The plaintiff is essentially put into a choice, either to abandon its religious convictions and act in a manner contrary to its religious faith, or continue acting as it is doing and expose itself to possible risk of future enforcement proceedings. That is the injury, and there's nothing speculative about that injury, because the plaintiffs today are being forced to make this choice between two unpalatable options. That is an actual, imminent, present-day injury. There is nothing hypothetical or speculative about it. How has their conduct been chilled? The conduct hasn't been chilled in the sense that they have changed their behavior, but it has still been chilled, regardless of whether they changed their behavior. But how can you answer that on behalf of a class? Because it doesn't matter what choice they make, Judge Wilson, because a litigant is chilled regardless of whether the litigant chooses to acquiesce to the threat and change its behavior. For example, abortion doctors did not need to stop providing abortions in case they were feeling chilled by the threat of possible prosecution. They suffered Article 3 injury regardless. Now, if they had shut down their practice, they would also have Article 3 injury. But if they continued their practice and exposed themselves to the threat, that too is Article 3 injury. Either way, there's a chill. How a litigant responds to the chill is not relevant to whether there is injury, in fact, from the chill. But what's the limiting principle? I mean, basically, if we accept the classes certified by the district court, if we accept that the plaintiffs have standing and the claims are ripe, I mean, this is the mother of all pre-enforcement actions, is it not? In other words, we're almost close to the taxpayer suit challenging whatever Congress does that the taxpayer doesn't like. I don't think so, Judge Wilson. Tell me how. Because every member of this class is facing a chilling effect from the EEOC's threats. We're not certifying a class of all affected individuals or all interested individuals. It's those with religious objections or, in some cases, secular objections to homosexual or transgender behavior. It's employers with 15 or more employees, only employers who are subject to Title VII in the first place. But aren't we basically reading out, reading Bostock out of existence? I mean, basically, anybody who says, well, I'm opposed to this, can opt out of what the Supreme Court has said and what the EEOC, I mean, has interpreted Bostock to say. Not quite. How do we do that? There's still quite a lot of room for Bostock, first with respect to secular employers who are the vast majority of employers subject to Title VII. Only 15 or more, only employers with 15 or more employees are subject to the statute in the first place. All right. There's exceptions and all that. Yes. But I'm just saying, I mean, do you get where I'm going here? If we allow this, what is the limiting principle for a whole bunch of preemptive challenges for everything Congress does? There is certainly a limiting principle. Let's start with Poe against Oldman. I think that's the easiest case, where you have an antiquated law that's never being enforced and the prosecutor specifically disclaims any intent to enforce the law. This was a statute that banned contraception. And the Supreme Court said no Article III standing. They didn't say it's unripe, but it would have been unripe as well. And there was no Article III standing because there was no credible threat or credible fear that the statute might be enforced against those plaintiffs. That's the easy case. Now, there may be some cases that are in between Poe against Oldman and this case. And the questions for the court would be to decide, is this more like Poe against Oldman, where there's just no credible threat of enforcement, or is it more like this case, where there is a credible threat, because they've already sued the Harris Funeral Homes over this. One of the cases the government cites is School v. Ozarks, an Eighth Circuit case, which is in between Poe against Oldman and this case. And the Eighth Circuit said there was no Article III standing because, in the court's view, the plaintiffs' allegations of threatened enforcement were too speculative. But Ozarks is easily distinguishable from this case because there had been no past history of enforcement of this policy against religious objectors who were specifically protected by a statutory exemption in Title IX. So let's look at the breadth of the classes that have been identified. So let's take, hypothetically, a mom-and-pop pizza parlor or a mom-and-pop hardware store that employs 20 persons, and the owners of the store claim religious or moral objection to having employees who engage in homosexual contact. That's the hypothetical. This class would apply to every such business in the United States. That's correct. But not to churches, right, because the judge specifically decided to carve them out. That's right. I'm just talking about commercial. That is right. It would apply to everyone, and since you don't normally question sincerity, so it would be basically a nationwide class of every such business. That's correct. I mean, we obtained nationwide relief in this case, but we did it the lawful way. We asked for a certified class. The controversy raging today over nationwide injunctions is when district courts enter nationwide relief without a certified class. And that's been widely criticized, and I think deservedly so, for evading the requirements of Rule 23. The government acts as though this is some type of extraordinary remedy, but we see district courts all the time giving out nationwide injunctions like candy, even when there's no certified class. Here, we sought class certification under Rule 23. There's nothing improper about giving class-wide relief, as long as the decision to certify the class was proper, and for the reasons that are brief, we don't think the government comes close to showing an abuse of discretion in the district court's decision to certify. Your claim is that there's no need for individualized determinations because it applies, as I stated. I think that's right. Not as a matter of law. These are pure questions of law. Right? Is there a compelling interest in requiring, objecting religious employers to comply with Bostock? That question, the answer to that question, in our view, does not in any way hinge on the specific facts of an employer. There either is a compelling government interest, or there isn't. And for the reasons we explained in our brief, we don't think the government can possibly show a compelling government interest when the statutory scheme is riddled with exemptions. There's exemptions for fewer than 15 employees, for example, or employers with fewer than 15 employees. There are exemptions for Indian tribes. And we know from Fulton and Tandon, these recent Supreme Court cases on compelling interests, when you have exemptions to a statute, that makes it impossible for the government to show that the interest is of such compelling importance that it can override a claim of religious freedom. So yes, Judge Smith, to answer your question, all of the answers to these questions we believe can and should be answered in the abstract, without regard to the specific facts on the ground, because they are pure questions of law that can be resolved by looking to whether there are other exemptions in Title VII, and that shows there's no compelling interest because Congress was willing to exempt all of the employers with fewer than 15 employees. Congress was willing to exempt Indian tribes. Congress was willing to make other exemptions. Certainly they can make an exemption here without the sky falling. And that's all, the same analysis carries over to substantial burden and least restrictive means. So there's nothing at all improper about this type of relief. We've also seen, it's not unusual for class-wide relief to be entered in cases where litigants assert constitutional rights. We see it in prisoner litigation. We see it in First Amendment litigation. We see it in abortion litigation. Class-wide relief is appropriate as long as a class has been certified consistent with the requirements of Rule 23. Your Honors, if I could, I'd like to spend some time on the merits of our appeal. There are two separate appeals. We have appealed some portions of Judge O'Connor's ruling on the merits. The government has also cross-appealed on the issues of compelling interest and substantial burden and matters of that sort. And we believe the district court should have accepted the plaintiff's claim that bisexual employees and job applicants are not protected by the holding of Bostock. The district court disagreed with us on that point. But we believe Bostock properly construed allows employers to continue discriminating against bisexual employees and job applicants if, and only if, the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman. An employer does not engage in so-called sex discrimination if he would treat an identically situated member of the opposite biological sex the same as the employee in question. That is a highly formalistic distinction, and we acknowledge that in our brief. But Bostock is a highly formalistic opinion. It was criticized for its formalism. But that is the binding pronouncement of the Supreme Court. And the fact remains that the relevant statute, Title VII, prohibits discrimination on the basis of sex, but does not yet prohibit discrimination on the basis of sexual orientation. And it won't until Congress amends the statute or enacts something akin to the Equality Act. So we don't suppose or extend Bostock and assume what the Supreme Court would say about it. We simply say that Bostock did not speak to that, therefore the statute controls. Is that? I would phrase it slightly differently, Judge Smith. I think Bostock did speak to this. Bostock says in the opinion that as long as the employer finds the relevant trait equally intolerable in an identically situated member of the opposite biological sex, there cannot be sex discrimination under the meaning of the statute. And Bostock itself was careful in the way it wrote the opinion to limit its protections to homosexual and transgender employees. It specifically said homosexual, did not include bisexual, and never said in the opinion that discrimination on account of sexual orientation categorically is prohibited by Title VII. And the EEOC guidance documents depart from Bostock in that respect. They have construed Bostock, and even before Bostock, they have construed Title VII, to prohibit all forms of discrimination based on sexual orientation. And perhaps that's a noble policy to pursue, but it needs to be enacted by Congress before the EEOC can go out and enforce the statute and interpret the statute this way on its own initiative. There has been legislation pending in Congress to fill this gap in Bostock. The Equality Act would plug that hole and fill some other holes in the Bostock holding. But until Congress gets around to changing the statute, the Court should accept the formalism of Bostock and apply the test that Bostock instructs the lower courts to apply, which is you take a hypothetical employee, keep everything about that person the same, but change the biological sex, and only the biological sex, and ask whether that would change the employer's action. That is the test for sex discrimination under Bostock. And Bostock says that's the only permissible interpretation of the statutory text. The other issue where we disagree respectfully with the district court is on its conclusion about the use of hormone therapy and the undergoing of sex change operations by employees. Because here, too, like with bisexual employees, it is possible for an employer to engage in sex-neutral policies that comply fully with Bostock, as long as he's treating biological men and biological women the same. So let's consider the issue of hormone therapy. You might have an employer who would decline to hire or discharge a female employee who takes testosterone therapy to look like a man. If the employer would also take the same action against a male employee who takes testosterone therapy in order to have bigger muscles, he's not engaging in sex discrimination because he's treating the man and the woman who engage in the exact same conduct the same way. The only way that employer can be guilty of sex discrimination under Bostock is if he would draw a distinction between the man who takes testosterone therapy and the woman who takes testosterone therapy. The same analysis would carry over to a man or a woman who undergo breast augmentation surgery. If an employer would fire the man who engages in such a surgery because he wants to look like a woman, but would also fire a woman who undergoes the same type of surgery, simply to appear more feminine, he has not engaged in sex discrimination under Bostock. It's only if he would treat the two types of employees differently in that particular context. Shifting to something slightly different, as to any of your arguments, whether it's a standing or the merits or otherwise, tell us what effect, if any, you think has the you have a current dispute with your insurer, the medical insurance. Medical insurance. That there's a current dispute, isn't there, about what's covered and what isn't? I read that in the brief somewhere. Does that not ring a bell? Is this about whether the employer is providing insurance to cover certain types of conduct? Yes. I'm sorry. Yes. Yes. Yes. Yes. Yes. So an employer... That was Braidwood. So Braidwood wants to exclude certain stuff from its self-insured plan. Right? So... What effect does that have on your argument? So there's some other statutes in play, because there's also Section 1557 of the Affordable Care Act, and it's actually a different lawsuit we're litigating with respect to that issue as well. But if Braidwood wants to exclude certain types of coverage from its self-insured plan, maybe it doesn't want to recognize same-sex marriage and would not extend coverage to a same-sex spouse. That would implicate Title VII. Right? So the implications... First, the court needs to ask the RFRA question. Does this employer have a sincere religious objection to homosexual behavior? No one's questioning the sincerity of Dr. Hotze's religious beliefs in this particular case. Then proceed to substantial burden. Is it a substantial burden for the EEOC to come in and say that Title VII requires you to recognize same-sex marriage and extend health benefits to same-sex spouses of your employees on the same terms as opposite-sex spouses? Is that a substantial burden on your religious freedom? We believe it is for the reasons we've stated in our brief. And then the final question is compelling interest. Is there a compelling governmental interest in requiring Dr. Hotze's business to comply with the EEOC's edicts on what Title VII means? And we don't think the government can show a compelling interest because there are other exceptions in the statute. They categorically exempt the employers with fewer than 15 employees. They also categorically exempt Indian tribes. There are other exemptions. The statute is full of exemptions. And both Fulton and Tandon hold that when you have a statutory scheme that is subject to exceptions, the government can't turn around and then deny exemptions for religious objectors on the basis of compelling interest. But with regard to the insurance dispute, how does that relate to the EEOC? Isn't that between Braidwood and the insurer? No, Braidwood has a self-insured plan. So Braidwood itself determines what's— The administrator? Yeah, it would be the third-party administrator. So the third-party administrator in this case—this was also an argument for standing—the third-party administrator was unwilling to implement Braidwood's instructions because the third-party administrator thought it was unlawful, given what the EEOC— All right, but how does that relate to the government? Because it's the government's edicts that have caused the third-party insurer to balk at Braidwood's instructions. This is a standing— Well, the insurer basically said, well, if you want to go get a declaratory action, go do it, but we're going to cover same-sex couples. And so why wouldn't that be the case or controversy between Braidwood and the insurer? Well, it also creates a case of controversy between Braidwood and the EEOC because it's the EEOC's edicts that is causing its third-party administrator— Where did the third-party administrator cite that? I mean, whatever I read, same as Judd Smith, I knew it was in there somewhere. We have a letter in the record. They don't specifically cite—you're right, they don't specifically cite— They just say, we're not going to do this because we think it's— Because we think it's illegal. That's right. Well, I mean, again, how does that tie to the EEOC? Look, maybe they think Obergefell requires them to do it. I don't know. I can't read their mind in terms of what they said in the letter because they just make a generic reference to the law. They don't specifically point out the EEOC is going to come after us. The EEOC couldn't really come after them because they're just a third-party administrator. They're not violating the law in their context as an employer. But for whatever reason, the third-party administrator thought that what Dr. Hotze was requesting with respect to his self-insured plan was not consistent with the law. Now— Well, right. But I mean, there again, I'll credit you, maybe a case of controversy between Braidwood and the insurance company, but I don't see how that daisy-chains in the EEOC and others for Title VII. I mean, we're talking about—isn't that Hobby Lobby or Little Sisters of the Poor or one of those other cases? Braidwood still has a dispute with the EEOC independent of this separate issue with its self-insured plan and the third-party administrator bridling it with Braidwood's instructions. I think Your Honor is correct that Braidwood could have brought a declaratory judgment action against its third-party administrator to get a ruling on this. I'm just trying to follow your argument about how that gets us to standing or ripeness with the EEOC. I don't think we need to rely on that to get to standing or ripeness with the EEOC. But I thought you said you were relying on it. It was— Well, it's yet another reason for why Braidwood is suffering injury, in fact. But if Braidwood's third-party administrator completely complied with its instructions, Braidwood still would have standing to sue the EEOC because Braidwood is still facing this threat of possible enforcement action. That's the point. I think that the insurance dispute might be irrelevant whether they're standing or ripeness with the EEOC. Yeah. I wouldn't quite say irrelevant. I would say maybe redundant. It's not necessary for us to rely on that, but it's yet another way in which Braidwood is being affected adversely by the EEOC's actions. Maybe you're right to say we can't prove that it's the EEOC itself that's causing the third-party administrator to do what it's doing. Maybe it was Obergefell. Maybe the third-party administrator is misunderstanding Obergefell as binding private parties to recognize same-sex marriage. I think many people have construed Obergefell that way. But regardless, Braidwood has injury, in fact, many different ways. It has injury, in fact, coming or going, whether we rely on this or not. But it's just another example of how a private employer is being affected adversely by what the EEOC is doing. I see my time has expired. I'm happy to answer additional questions. Mr. Mitchell. Thank you, Your Honors. Ms. Hanau, you can take some time for rebuttal. Thank you. I have four points on rebuttal. First, plaintiffs acknowledge that the chilling effect is the necessary Article III injury to establish a case for controversy and to show standing. But in this case, plaintiffs have made clear that their religious exercise has not been chilled. They can continue conducting their business the way they have for years without any impact on their religious exercise. And a subjective chill, even if plaintiffs are saying they have some sort of subjective fear that they're not acting on, a subjective chill is not enough, and the Supreme Court made that clear in Clapper. Second, the class-wide nature of the relief granted by the district court is inappropriate in this case because the district court's decision assumes that religious views are monolithic and uniform. It assumes that everyone in this class, all of these thousands of employers, have the same views on what plaintiffs call transgender and homosexual conduct, and they have the same views on how that will affect the employer's religious exercise. But federal courts are not at liberty to generalize about closely held religious beliefs for an entire class. How did the district court, though, define that class insofar as religious beliefs are concerned? What is the language from the injunction? So the district court defined the religious business type employers as all employers opposing homosexual or transgender behavior based on sincere religious beliefs, and these are for for-profit entities producing secular products. So why isn't that—in other words, a company isn't in the class unless it fits that definition. Why isn't that definition enough to define which companies are in the class and which are not? It's not enough, Your Honor, because the fact that an employer itself opposes homosexual or transgender conduct does not necessarily mean that the employer would feel compelled to fire employees who do not share those religious beliefs. I think many employers in this class would feel surprised that merely giving someone a salary means that they're endorsing everything that their employees do. Well, wait. I'm going to stop you because you've said that before in your main argument. It's more than just giving someone a salary. I mean, you're inviting someone in if you're a relatively small business to the corporate culture, the company's ethics, the company's values, and obviously the employee doesn't just get paid. They've got to show up and work and be part of the team and all that. So I don't think you can minimize that entirely. It's not just an economic transaction in a lot of cases. Your Honor, I don't mean to minimize the situation. My point is that for some employers, it may be the case that they can show a substantial burden on their religious exercise, but it cannot be true that at this level of generality for every employer in this broad class that they necessarily feel the same way. We need the facts of how the other employers exercise their religion to know how the refer analysis would come out. Back to Judge Smith's point, though, and I think yours, too. If there were an employer there somewhere who may oppose homosexuality or oppose transgenderism, whichever the category is that the district court included, but they might not fire their employees. They might treat them just fine. They might accord them same-sex insurance benefits for their spouse. They're never going to fall afoul of Title VII, but does that mean that they shouldn't be afforded the religious protection anyway? Just because they don't use RFRA as a defense doesn't mean they wouldn't be entitled to it, right? I think it's still a problem in this case because the district court's decision binds every employer in the class, both on the claims on which plaintiffs spawn and also the claims on which plaintiffs lost. So every employer in this class is bound by the district court's rulings. This case is not about whether there can be some RFRA exceptions in future situations. There will be a day in court for those cases, but this court cannot pre-resolve those issues now at this level of generality. There is no regular type of litigation where courts carve out particular legal issues to If there are no further questions, we'd ask the court to reverse. Thank you. Thank you, Ms. Honnold. Your case is under submission.